# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS M. BOYLE, | ) 1:06cv1772 OWW DLB |
| | ) |
| Plaintiff, | ) FINDINGS AND RECOMMENDATION<br>) REGARDING PLAINTIFF'S<br>) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| MICHAEL J. ASTRUE, Commissioner<br>of Social Security, | ) |
| | ) |
| Defendant. | ) |

## BACKGROUND

Plaintiff Dennis M. Boyle ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, for Findings and Recommendation to the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed his applications on April 30, 2004, alleging disability since January 7, 2004, due to chronic, debilitating knee pain. AR 63-65, 68-77, 198-209. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

Judge ("ALJ").  AR 46-50, 51, 58.  On March 29, 2006, ALJ James E. Ross held a hearing, and on June 27, 2006, he denied benefits.  AR 10-19, 214-233.  On October 11, 2006, the Appeals Council denied Plaintiff's request for review.  AR 5-8.

Hearing Testimony

ALJ Ross held a hearing in Fresno, California, on March 29, 2006.  Plaintiff appeared with his attorney, Robert Ishikawa.  AR 214.

Plaintiff testified that he was 42 years old at the time of the hearing.  He graduated from high school and last worked in August 2003, as a care provider.  AR 218.  Prior to that, he worked as an electrician, an auto parts counterman, a dispatcher/driver for a taxi service, and a receiving clerk.  AR 219-221.

Plaintiff explained that he started having problems with his knees as a child and had his first surgery in 1977, when he was 13 years old.  He had his fourth knee surgery in 1991 and a total right knee replacement in 2005.  The four prior surgeries resulted from sports-related injuries.  Although Plaintiff has lost 50 pounds, it has not helped his pain.  AR 222-223.  His right knee was the first to be replaced, but Plaintiff believed that his left knee was worse.  Doctors have told him that he needs his left knee replaced, too, and it is just a matter of when he chooses to do it.  He was planning to set a tentative date for the surgery at an upcoming appointment at University of California, San Francisco ("UCSF").  AR 224.

Plaintiff testified that he can walk approximately one half mile before needing to sit down.  He could stand for maybe 30 to 45 minutes before needing to sit down and his left knee swells.  He still has pain in his right knee, too, if he stands for any length of time, but indicated that the right knee was still in the healing process.  AR 225.  As for sitting, he can't sit for any length of time before he starts getting numbness in his left knee and then has to get up and move around.  He thought he could sit for about one hour at one time, but then explained that he could sit, while alternating with standing, for about an hour or two at a time.  AR 225.  He can bend his knee, but not kneel.  AR 227.

Plaintiff elevates his leg three or four times a day to get the swelling down, for about 20 to 30 minutes a time.  AR 225.  He also ices his leg three to four times a day.  AR 226.  He takes

various pain medications and uses heat and massage. AR 226. Plaintiff explained that the pain medication causes nausea, restlessness, extreme mood swings and problems concentrating. AR 226. He can sometimes concentrate on a television program for one hour, but not very often. AR 227.

During the day, Plaintiff does very little. He sits around and watches his wife work, and will sometimes help her with light housework. He gets out of bed and raises his leg until there is some sensation in it, then sits in front of the television and does nothing. He tries to get up and walk around to keep the sensation in his legs. He may go grocery shopping with his wife, but cannot go if it will take more than 30 minutes. AR 229. He goes to church on Sundays and may have friends come over. AR 229. Plaintiff can usually make it through Sunday services, which take about an hour, but he has had to excuse himself from church before. AR 229. He can drive, but only short distances and only if he's having a good day. AR 230.

<u>Medical Record</u>

X-rays of Plaintiff's knees taken on January 14, 2004, revealed minor productive changes involving the right and left patella with some minor productive changes involving the lateral femoral condyle on the left side. AR 126.

On January 21, 2004, Plaintiff saw Gloria Jean Malabed-Verona, M.D. He complained of pain in both knees and his right elbow. On examination, he had crepitus of both knees as well as discomfort with range of motion. She diagnosed bilateral knee pain, right more than the left. She gave Plaintiff a trigger point injection to the right knee. Plaintiff reported that Tylenol #3 did not help and Dr. Malabed-Verona decided to try him on Ultram. AR 129.

On February 2, 2004, Plaintiff returned to Dr. Malabed-Verona. He complained of pain in both knees, the right worse than the left. He walked with a limp and there was pain with range of motion in both knees, especially the right. He also had pain with standing, walking and movement. AR 127.

On August 8, 2004, Plaintiff saw Rosalinda Serrano, M.D., for a comprehensive orthopedic examination. He complained of bilateral knee pain and right elbow pain. Plaintiff reported that he shares household chores with his wife, but that his knees hurt. He is able to

drive.  Plaintiff sat comfortably during the examination and ambulated with a cane, with a slight limp.  He was unable to stand on toes and heels.  Range of motion was restricted and with pain.  Upper and lower extremity strength was 5/5.  Crepitation was noted in the knees.  Dr. Serrano diagnosed sprain/strain bilateral knees, with a history of four surgical interventions, two on each side.  She opined that Plaintiff could stand and/or walk for six hours in an eight hour day, with regular breaks.  He could sit for six hours in an eight hour day secondary to knee pain, crepitation and restricted range of motion.  He would have difficulty climbing and would have some difficulty with pushing and pulling of heavy objects.  Plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally.  He could not push, pull, crawl, kneel or bend because of pervious surgery and persistent knee pain.  AR 144-147.

On August 27, 2004, State Agency Physician Patrick Bianchi, M.D., completed a Physical Residual Functional Capacity Assessment.  Dr. Bianchi opined that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk, with normal breaks, for about six hours in an eight hour work day, and sit, with normal breaks, for about six hours in an eight hour work day.  Plaintiff could occasionally push pedal controls bilaterally.  He had to avoid all climbing of ladders, ropes or scaffolds, but could occasionally climb ramps and stairs.  He could occasionally balance, stoop, kneel, crouch and crawl.  AR 156-163.

On November 23, 2004, Dr. Pong, a State Agency Physician, completed a Physical Residual Functional Capacity Assessment.  Dr. Pong opined that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk, with normal breaks, for about six hours in an eight hour work day, and sit, with normal breaks, for about six hours in an eight hour work day.  Plaintiff could not operate lower extremity foot controls.  He could occasionally climb, balance, stoop, kneel, crouch and crawl.  AR 148-155.

Plaintiff saw Dr. Malabed-Verona on March 4, 2005.  He complained of pain in both knees.  He walked with a limp and used a cane to move about.  There was crepitation in both knees, especially the right.  Dr. Malabed-Verona diagnosed bilateral knee pain secondary to degenerative joint disease and ordered an MRI of both knees.  She referred him to Stanford orthopedics and gave him Toradol.  AR 168.

On March 30, 2005, Plaintiff saw Eliana D. Delgado, M.D., at UCSF Medical Center. On examination, he had marked limitation of knee flexion and extension with pain. He also had 4+/4 crepitus. Strength and tone were normal in all extremities. X-rays were consistent with tricompartmental degenerative osteoarthritis with osteophytes and scoring of the condyle. Dr. Delgado diagnosed degenerative osteoarthritis of the knees and recommended Synivis therapy and vocational rehabilitation. AR 169-170.

Also on March 30, 2005, Plaintiff underwent an MRI of his left knee. It revealed markedly abnormal lateral meniscus with an appearance suggestive of a superior vesicular attachment tear of indeterminate age as well as only a posterior remnant of the lateral meniscus. The test also showed patellar tendonitis, prepatellar bursitis and osteoarthritic changes. AR 171.

Plaintiff saw Dr. Delgado on April 6, 2005. She opined that he would ultimately need bilateral total knee replacement, but because of his age and activity status, she wanted to maintain conservative management as long as possible. However, she recommended that he go forward with arthroscopy on the left knee with appropriate rehabilitation. AR 194.

On June 1, 2005, Plaintiff saw Kevin Bozic, M.D., as UCSF. After examining Plaintiff and reviewing his x-rays and MRI results, Dr. Bozic diagnosed Plaintiff with tricompartmental degenerative arthritis involving both knees, more symptomatic and advanced on the right. Dr. Bozic felt that Plaintiff had a significant trial with conservative treatment measures with no significant benefit. Dr. Bozic believed that a total knee replacement was the best option, but explained to Plaintiff that his age (41 years old) and weight (285 pounds) put him at risk for early revision surgery. AR 191-192.

On June 17, 2005, Plaintiff underwent a total right knee replacement, performed by Dr. Bozic. AR 172, 178-188.

On August 3, 2005, Plaintiff saw Dr. Bozic for his six-week follow-up appointment. Plaintiff was progressing with physical therapy and felt that his pain had decreased since surgery. Plaintiff walked with a very slow, cautious gait with a slight limp on the right. There was no instability. Dr. Bozic indicated that Plaintiff continued to do well and wanted him to focus on quadriceps strengthening as well as range of motion and gait training. AR 174.

Plaintiff saw Dr. Bozic in follow-up on November 9, 2005. Plaintiff continued to have pain and felt that his progress has been slow, but overall he had made some progress and improved since his last visit. He did not walk with a detectable limp. There was no instability and strength was 5/5 in the quadriceps. X-rays showed a well-fixed, well-aligned, cemented, posterior cruciate-retaining right total knee replacement with no interval change in the position of the implants, no wear, osteolysis, loosening or other changes. AR 173. Dr. Bozic opined that Plaintiff continued to make progress. He wanted Plaintiff to continue with his exercise program, primarily focusing on isometric quadriceps strengthening, range of motion and other passive modalities. He instructed Plaintiff to return in six months for his one-year follow-up appointment. AR 172.

On March 22, 2006, Dr. Malabed-Verona completed a Medical Assessment of Ability to Do Work-related Activities. She opined that Plaintiff could occasionally lift and/or carry 10-15 pounds, 5 pounds frequently. Plaintiff could stand for a total of eight hours in a work day, for 30 minutes at a time. He could sit for four to six hours in an eight hour work day, for 30 to 60 minutes at one time. Plaintiff would need to straighten his leg or get up to stand. He could occasionally climb and stoop, but could never kneel, crouch or crawl. Plaintiff could never balance. He had to avoid heights, moving machinery, extreme temperatures and vibration. Dr. Malabed-Verona believed that these restrictions began in 2002. AR 195-197.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairment of degenerative joint disease of both knees, status post right knee total replacement. AR 14. Despite this, he retained the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally and 10 pounds frequently. Plaintiff could not climb ladders, ropes or scaffolds, but could occasionally balance, stoop, kneel, crouch or crawl. He could not use foot controls. AR 15. Given this RFC for sedentary work, the ALJ determined that Plaintiff could not return to his past relevant work. AR 18. However, applying Medical Vocational Rule 201.28, the ALJ found that Plaintiff was not disabled. AR 19.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) has an impairment or a combination of impairments that is considered "severe" (degenerative joint disease of both knees, status post right knee total replacement) based on the requirements in the Regulations (20 CFR §§ 416.920(c)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P of Part 404; (4) cannot perform his past relevant work; but (5) retains the RFC to perform jobs that exist in significant numbers in the national economy.  AR 14-18.

Plaintiff argues that the ALJ (1) committed an error of law by failing to make findings regarding his ability to sit and stand; (2) improperly evaluated the physicians' opinions and assessments; and (3) improperly evaluated his testimony.

## DISCUSSION

A.   RFC Finding

Plaintiff first argues that the ALJ's RFC finding was flawed because (1) he did not make a finding regarding his ability to sit and stand in an eight hour day, and (2) he did not describe the "additional limitations" referenced in the decision.

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment must be based on all of the relevant evidence in the record, including the effects of symptoms that are reasonably attributed to a medically determinable impairment.  SSR 96-8p.  In addition, the adjudicator "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe,'" because such limitations may be outcome determinative when considered in conjunction with limitations or restrictions resulting from other impairments.  SSR 96-8p.

Here, the ALJ found that Plaintiff retained the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently.  Plaintiff could not climb ladders, ropes or scaffolds, and he could not use foot controls.  He could occasionally balance, stoop, kneel, crouch or crawl.  AR

15. When he applied the Medical-Vocational Guidelines, he determined that Plaintiff was restricted to sedentary work.

Although the ALJ did not made an express finding as to Plaintiff's ability to sit and stand, his finding that Plaintiff was restricted to sedentary work implicitly finds that Plaintiff was capable of sitting for six hours in an eight hour work day and standing and/or walking for at least two hours in an eight hour day. SSR 83-10; 20 C.F.R. § 404.1567(b). The ALJ's opinion as to Plaintiff's sit and stand capacity is also evidenced by his adoption of Dr. Pong and Dr. Bianchi's opinions, who each found that Plaintiff could sit, stand and/or walk, with normal breaks, for about six hours in an eight hour day.[2] AR 18.

Plaintiff also attempts to discredit the ALJ's opinion by arguing that the reference to "additional limitations" was not fully explained. However, the context in which the ALJ uses the phrase make it clear that he is referring to the limitations set forth in a prior portion of the opinion, i.e., the limitations that preclude him from performing a full range of light work, such as his inability to climb ladders, ropes or scaffolds, or use foot controls. AR 15, 18. Moreover, the ALJ uses the phrase in discussing the application of the Medical-Vocational Guidelines. AR 18. The explained that Plaintiff's non-exertional, "additional impairments" preclude him from light work and restrict him to sedentary work under the Guidelines. AR 19. Using either light work or sedentary work, however, the ALJ found the Guidelines directed a finding of not disabled. AR 19.

Plaintiff's claim is without merit.

B.  Medical Opinions

Next, Plaintiff argues that the ALJ improperly rejected the opinion of his treating physician, Dr. Malabed-Verano, in favor of State Agency physicians Pong and Bianchi.

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

---

[2] Whether the ALJ's decision to adopt Dr. Pong and Dr. Bianchi's opinions was supported by substantial evidence is discussed below.

9

physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991). Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).

If a treating physician's opinion is not giving controlling weight because it is not well supported or because it is inconsistent with other substantial evidence in the record, the ALJ is instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. 404.1527(d)(2)(i)-(ii). Other factors include the supportability of the opinion, consistency with the record as a whole, the specialization of the physician, and the extent to which the physician is familiar with disability programs and evidentiary requirements. 20 C.F.R. § 404.1527(d)(3)-(6). Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to deference." SSR 96-2p; *Orn v. Astrue*, 495 F.3d 625, 632-633 (9th Cir. 2007). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p; *Orn*, 495 F.3d at 633.

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990);

*Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456. In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen,* 881 F.2d 747, 751-55 (9th Cir.1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir.1995). For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians...." *Magallanes*, 881 F.2d at 752 (emphasis in original). Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

Here, the ALJ gave "very little weight" to Dr. Malabed-Verano's March 22, 2006, opinion. AR 17. Instead, the ALJ gave "significant weight" to the August and November 2004, opinions of the State Agency physicians. AR 17. In order to accept the contradictory non-examining physicians' opinion over Dr. Malabed-Verano's opinion, the ALJ needed to set out "specific and legitimate reasons supported by substantial evidence in the record." *Reddick*, 157 F.3d at 725. For the reasons set forth below, ALJ Ross failed to do so.

The ALJ stated that he gave "serious" consideration to Dr. Malabed-Verano's March 22, 2006, opinion, where she found that Plaintiff could "only perform, at best, restricted sedentary work." AR 17. However, the ALJ first stated that Dr. Malabed-Verano was an "internal medicine physician and not an orthopedic surgeon with expertise in the claimant's knee

impairment." AR 17. While the physician's specialization is a proper factor for consideration, the distinction between a physician specializing in internal medicine and one specializing in orthopedic surgery is not such a drastic difference to support the rejection of the treating physician's opinion. This reason loses further support because, as Plaintiff points out, there is nothing in the record indicating that either Dr. Pong or Dr. Bianchi, the State Agency physicians, are orthopedic specialists.

The ALJ next cites to purported inconsistencies in support of his decision to reject Dr. Malabed-Verano's opinion. He first explains that Dr. Bozic, Plaintiff's orthopedic surgeon, stated on November 9, 2005, that Plaintiff was making progress and continuing with an exercise program. The ALJ continues, "In fact, he was doing so well that he did not need to be seen again for another six months." AR 17. Indeed, Dr. Bozic's treatment note from November 2005, indicates that Plaintiff was making progress, but this does not necessarily mean that he did not have related limitations. The ALJ also puts too much emphasis on the fact that Plaintiff was instructed to return in six months; this does not necessarily mean that he was doing "so well," as the ALJ interprets it, but simply that Plaintiff needed to schedule his appointment for his one-year follow-up appointment. AR 172. Dr. Bozic's treatment notes are not necessarily inconsistent with Dr. Malabed-Verano's opinion.

Next, the ALJ explains that Plaintiff's own report of his activities demonstrates that he "is lifting greater weight than Dr. Malabed's restrictions." AR 17. ALJ Ross does not, however, further explain Plaintiff's alleged activities. When he sets forth Plaintiff's daily activities, there is no mention of Plaintiff's lifting activities. AR 16. Without knowing exactly what activities the ALJ is relying on, the Court cannot say that this is a legitimate reason. In any event, Plaintiff's May 2004, Daily Activities Questionnaire states that the heaviest things he can lift "are grocery bags." He only goes grocery shopping with his wife on good days. If he is sitting, he can lift his disabled son long enough to change him. AR 89. Similarly, at the hearing, Plaintiff testified that he hasn't been able to lift his son, who was 12 years old at the time of the hearing and wheelchair-bound, in three years. AR 232. To hold him, Plaintiff needs the assistance of his wife and daughter to lift him up. AR 232. Plaintiff's activities do not appear to

12

contrast with Dr. Malabed-Verano's belief that he could occasionally lift and/or carry 10-15 pounds and 5 pounds frequently.

Finally, the ALJ points to "internal inconsistencies" in Dr. Malabed-Verano's report as a factor in his analysis. Dr. Malabed-Verano based the lifting and carrying limitations on Plaintiff's knee instability, but stated that he could occasionally climb and frequently balance. AR 17, 195-196. The ALJ concludes "that if the claimant was not stable enough to lift 10 pounds frequently, he would not be stable enough to climb or balance." AR 17. Such a conclusion, though, is beyond the ALJ's expertise. An unstable knee may react differently under pressure from lifting than under pressure from exertional activities such as climbing or balancing. The ALJ may not substitute his own layman's opinion for the findings and opinion of a physician. *Gonzalez Perez v. Sec'y Health & Human Serv.*, 812 F.2d 747, 749 (1st Cir. 1987).

As evidenced by the recent Ninth Circuit case *Orn v. Astrue, supra*, the opinions of treating physicians are entitled to great weight. Of course, the ALJ is entitled to reject the opinions, but his reasons for doing so must be specific and legitimate. Here, the ALJ's analysis was comprised of misinterpretations and unsupported conclusions and were not sufficient to reject Dr. Malabed-Verano's opinion in favor of the non-examining State Agency physicians, especially considering the timing of the opinions. Plaintiff underwent a right knee replacement in 2005, subsequent to the State Agency physicians' 2004 assessments. Although the ALJ interprets the record as showing significant improvement after the 2005 surgery, the evidence of improvement is simply not strong enough to support a rejection of Dr. Malabed-Verano's opinion, especially where her opinion is the only one offered *after* the 2005 surgery. The evidence shows that Plaintiff continued to experience pain in his right knee and that he needed a left knee replacement, as well. AR 194.

Section 405(g) of Title 42 of the United States Code provides: "the court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In social security cases, the decision to remand to the Commissioner for further proceedings or simply to award benefits is within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d

599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate." *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed.").

Here, the ALJ improperly analyzed the physicians' opinions. The action should be remanded to the Commissioner for further evaluation consistent with this opinion. Upon remand, the ALJ must perform a legally sufficient analysis of the opinion evidence. A vocational expert should be used, if necessary. The ALJ should also obtain updated, post-surgery medical information and consider the possibility of a closed period of disability.

C.  Plaintiff's Credibility

Finally, Plaintiff argues that the ALJ failed to properly assess his credibility. Specifically, he contends that the numerous reasons set forth by the ALJ are not convincing or based on facts supported by substantial evidence.

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints. *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991). "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment," *Orn v. Astrue*,495 F.3d 625, 635 (9th Cir. 2007) (citation omitted). In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)). Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

"The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

In his decision, the ALJ explained that while Plaintiff's medical impairments could reasonably be expected to produce the alleged symptoms, his statements regarding the intensity, persistence and limiting effects were not entirely credible. AR 15.  First, the ALJ believed that Plaintiff was not taking the type of pain medications associated with severe, disabling pain. AR 16.  However, Plaintiff was prescribed Ultram in January 2004, after reporting that Tylenol #3 was not effective. AR 129.  The discharge report from June 2005, after his surgery, states that his prior treatment included injections, which were of limited benefit, as well as oral medications, including anti-inflammatories. AR 178.  He continued to take Ultram after his surgery, but it is unclear for how long. AR 176.  In any event, given Plaintiff's alleged onset date of January 7, 2004, and the evidence of prescription pain medications and injections for at least a year after that date, the ALJ's finding that Plaintiff was not prescribed the "type" of pain medications associated with severe pain is unfounded.

The ALJ next states that "as of June 17, 2005, only two months after his surgery, the claimant stated that his pain had decreased." AR 16.  The ALJ misread the date of this report, which was actually August 3, 2005. AR 174.  In any event, the simple fact that Plaintiff reported that his pain had *decreased* does not necessarily mean that his pain testimony was not consistent with the record.  In fact, when Plaintiff returned in November 2005, he reported that he continued to have pain and felt that his progress has been slow, although overall he had made some progress and improved since his last visit. AR 172.  Because the record supports a finding that Plaintiff's pain has gone through numerous cycles of improvement and deterioration, the ALJ

cannot isolate a statement made in August 2005 to support his finding that Plaintiff was not credible.

As the third reason for finding Plaintiff not credible, the ALJ found that despite Plaintiff's testimony that his medications cause significant side effects, the March 22, 2006, assessment completed by Dr. Malabed-Verona did not support his allegation. AR 16. The ALJ is entitled to examine inconsistencies in the record, including the lack of record evidence to support his testimony relating to the side effects. However, insofar as the ALJ suggests that Plaintiff drives and therefore his side effects cannot be so limiting, the statement is not supported by Plaintiff's testimony. At the hearing, Plaintiff explained that he drives "very little" and only short distances and if he's having a good day. AR 230. Specifically, he testified:

> If we're going up to the grocery store which is a few blocks away. If I'm feeling - if I'm having a good day, then I'll drive. But more often than not, if we're in the vehicle I'm in the passenger seat. I haven't driven out of town in over three years now.

AR 230. The ALJ's interpretation of Plaintiff's testimony is simply unsupported.

The ALJ next states that "from the time the claimant originally saw Dr. Malamed [sic] about his knee concerns, there is a gap of over one year before he returned for treatment." AR 16. Plaintiff first saw Dr. Malabed-Verona for complaints of knee pain on January 21, 2004. AR 129. He returned two weeks later, on February 2, 2004, but then did not return again until March 2005. AR 127. Although the ALJ is technically correct when he states that Plaintiff did not return for over one year, the inference he draws from this treatment gap is not supported given that in April 2005, Dr. Delgado opined that Plaintiff would ultimately need a total knee replacement in both knees. AR 194.

The ALJ then moves on to a discussion of Plaintiff's daily activities. Citing in part Plaintiff's Daily Activities Report, the ALJ explained that Plaintiff is able to

> get out of the house daily and is able to get out alone. He is able to drive. He is able to shop with his wife, handle money, spend time without others, including visiting friends and playing games with his family, and taking care of the family's pets. He also admitted that he can take care of his personal needs without assistance.

AR 16. The Ninth Circuit recently explained that the ALJ must make "specific findings relating to [the daily] activities" and their transferability to conclude that a claimant's daily activities

16

warrant an adverse credibility determination. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007) (citing *Burch*, 400 F.3d at 681). It is not apparent how the activities noted by the ALJ, even assuming that it is a fair representation of Plaintiff's testimony, translate into an ability to perform work activities. In any event, the Daily Activities Questionnaires in the record do not support the level of activities suggested by the ALJ. AR 78-80, 88-91.

Next, the ALJ suggests that Plaintiff's subjective complaints are unfounded because although he uses a cane, there is no prescription for a cane in the record. AR 16. However, as Plaintiff points out, there are notations in the record to Plaintiff's use of a cane, perhaps making an actual prescription unnecessary. Both Dr. Malabed-Verano and Dr. Bozic noted that Plaintiff used a cane to ambulate, and there is no indication in the record that a cane was *not* necessary. AR 168, 176.

Finally, the ALJ suggests that because Plaintiff was capable of attending the hearing and participating in his own behalf, his subjective complaints could not be as severe as alleged. The ALJ may rely on his own observations at the hearing, the nature of Plaintiff's impairment does not lend itself to evaluation in this manner. Plaintiff was applying for benefits based on his knee impairment and the general fact that he was "capable of attending the hearing and participating in his own behalf," without more, does not call into question his subjective complaints of knee pain.

Of the numerous factors that the ALJ set forth in defense of his credibility analysis, only one appears to be arguably valid. The Court is therefore unable to conclude that the ALJ did not arbitrarily discredit Plaintiff's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

On remand, the ALJ must either perform a legally sufficient analysis of Plaintiff's credibility or credit his allegations.

**RECOMMENDATION**

Accordingly, based on the above, the Court RECOMMENDS that Plaintiff's appeal be GRANTED and that the action BE REMANDED for further proceedings consistent with this opinion. The Court further RECOMMENDS that judgment be entered in favor of Plaintiff Dennis M. Boyle and against Defendant Michael J. Astrue.

These Findings and Recommendations are submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    **February 25, 2008**          **/s/ Dennis L. Beck**
UNITED STATES MAGISTRATE JUDGE